Filed 4/30/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH BOCKLETT,<br><br>    Defendant and Appellant. | D071983<br><br><br><br>(Super. Ct. No. MH110895) |

APPEAL from a judgment of the Superior Court of San Diego County, Howard H. Shore, Judge. Affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

Joseph Bocklett appeals from a jury verdict adjudicating him a sexually violent predator (SVP) under the Sexually Violent Predators Act (the Act) (Welf. & Inst. Code,[1] § 6600 et seq.). On appeal, he challenges the constitutionality of Penal Code section 3000, subdivision (a)(4) (hereafter Penal Code section 3000(a)(4)), which tolls the parole period for an SVP on equal protection and ex post facto grounds. He also asserts that the procedure for obtaining conditional release under the Act violates equal protection. We disagree and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In November 2014 the San Diego County District Attorney filed a petition seeking to commit Bocklett as an SVP under the Act. Bruce Yanofsky, Ph.D., a clinical and forensic psychologist, evaluated Bocklett to determine whether he is an SVP. Dr. Yanofsky interviewed Bocklett three times—in 2014, 2015 and 2016. He reviewed Bocklett's criminal records, medical records, probation reports, and police reports for two of Bocklett's crimes.

Dr. Yanofsky read a police report regarding the offense Bocklett committed in 1976, and then talked to Bocklett about that conviction. In 1976, when Bocklett was 31 years old, he molested his nine-year old stepdaughter for several months. He then started molesting his five-year-old stepdaughter. Bocklett explained that he started molesting his stepdaughters for sexual gratification and found their innocence appealing. He pleaded guilty to a single count of committing a lewd or lascivious act on his younger stepdaughter in violation of Penal Code section 288. Bocklett was placed on probation

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

and received treatment. He did not find the treatment to be effective and did not "care for it."

In 1983, when he was 38 years old, Bocklett married a woman and then began molesting his four-year-old stepson by having the child play with his penis, engaging in mutual oral copulation and then sodomizing the boy. Bocklett admitted to Dr. Yanofsky that he enjoyed molesting the boy, had fantasies about him, and acted out or experimented with some of his fantasies with the boy. The molestation continued for approximately a year, on an almost weekly basis. Bocklett pleaded guilty to sodomy (Pen. Code, § 286, subd. (c)) and was sentenced to 13 years in prison. He was released from prison in 1990 and received treatment. He stopped receiving treatment because he did not want to hear about other people's problems.

Bocklett also told Dr. Yanofsky that in 1994 he molested the four-year-old daughter of a woman he had met through a dating service and eventually married. He saw the child naked and became excited. He started "rubbing her." He later orally copulated and digitally penetrated the child. He found the molestation difficult to stop and believed that the conduct was "okay" as long as it was consensual or the child went along with it. He eventually pleaded guilty to a lewd or lascivious act on a child under 14 years old (Pen. Code, § 288, subd. (a)).

Dr. Yanofsky determined that Bocklett had three qualifying prior convictions for sexual offenses and thus met the first SVP criteria. Bocklett also satisfied the second SVP criteria, the presence of a mental health condition that predisposes a person to commit sexual crimes. Specifically, Dr. Yanofsky diagnosed him with pedophilic

3

disorder, mixed type and nonexclusive in that Bocklett is sexually attracted to both male and female individuals, young children, and adults. Dr. Yanofsky also determined that Bocklett was likely to engage in violent sex offenses if released, the third SVP criteria. Dr. Yanofsky testified that Bocklett's reoffense would be predatory in nature because Bocklett has a history of forming relationships with vulnerable woman to gain access to their children to gratify his sexual needs.

Harry Goldberg, Ph.D., a forensic psychologist, also interviewed Bocklett three times over three years to determine if Bocklett met the criteria for commitment as an SVP. Dr. Goldberg also reviewed Bocklett's records, including police reports. Dr. Goldberg opined that Bocklett met the criteria for commitment as an SVP.

Brian Abbott, Ph.D., a licensed clinical psychologist, testified for the defense. He interviewed Bocklett three times—in March 2015, April 2016 and January 2017. Dr. Abbott testified that Bocklett does not currently suffer from pedophilic disorder. Dr. Abbott found that Bocklett "may have continued to have pedophilic arousal through 2008," but there was no evidence that Bocklett suffered from the disorder after 2008. Dr. Abbott did not believe that Bocklett posed a serious and well-founded risk of engaging in sexually violent predatory acts.

Dr. Abbott reviewed the evaluations prepared by Drs. Yanofsky and Goldberg. Dr. Abbott criticized the clinically adjusted actuarial approach utilized by Drs. Yanofsky and Goldberg to evaluate Bocklett. Although such an approach identifies sources of risk, Dr. Abbott testified that an SVP evaluation is concerned with the probability or

4

likelihood of risk. Thus, in Dr. Abbott's opinion, the approach utilized by Drs. Yanofsky and Goldberg is not relevant in addressing the substantial danger threshold.

DISCUSSION

I. *THE ACT*

An SVP is defined as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) Whenever the director of the Department of Corrections and Rehabilitation determines that a defendant serving a prison term may be an SVP, a screening is conducted in accordance with an assessment protocol developed by the Department of State Hospitals (DSH). (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1183.) " 'If that screening leads to a determination that the defendant is likely to be [an SVP], the defendant is referred to the [DSH] for an evaluation by two psychiatrists or psychologists. (§ 6601, subds. (b) & (c).) If both find that the defendant "has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody" (§ 6601, subd. (d)), [DSH] forwards a petition for commitment to the county of the defendant's last conviction (*ibid.*). If the county's designated counsel concurs with the recommendation, he or she files a petition for commitment in the superior court. (§ 6601, subd. (i).)' " (*Ibid.*)

The trial court reviews the petition and determines "whether the petition states or contains sufficient facts that, if true, would constitute probable cause to believe that the

5

[alleged SVP] is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6601.5.) If the trial court determines the petition, on its face, supports a finding of probable cause, then the court orders that the offender be kept in a secure facility until a probable cause hearing under section 6602 is conducted. (§ 6601.5.) If the trial court finds probable cause, it orders a trial to determine whether the offender is an SVP under section 6600. (§ 6602, subd. (a).) The offender must remain in a secure facility between the time probable cause is found and the time trial is completed. (*Ibid.*)

At trial, the trier of fact determines whether, beyond a reasonable a doubt, the offender is an SVP. (§ 6604.) To establish a person is an SVP, the government must prove the following: (1) the offender has been convicted of a qualifying sexually violent offense against at least two victims, (2) the offender has a diagnosed mental disorder, (3) the disorder makes it likely the offender would engage in sexually violent conduct if released, and (4) this sexually violent conduct will be predatory in nature. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 246 & fn. 9.) The government must establish these elements beyond a reasonable doubt and the jury must unanimously agree before finding the defendant is an SVP. (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 648.) If the trier of fact determines the offender is an SVP, the offender is committed for an indefinite term to the custody of the DSH for appropriate treatment and confinement in a secure facility. (§ 6604.) Persons undergoing the commitment process as an SVP and persons committed as an SVP have their parole periods tolled until they are discharged from their SVP commitment. (Pen. Code, § 3000(a)(4).)

6

## II. *ALLEGED EVIDENTIARY ERROR*

### A. *Additional Background*

The People sought the admission of three exhibits—one relating to each of Bocklett's qualifying offenses. Two of these exhibits contained redacted police reports relating to his 1983 and 1994 qualifying offenses. Defense counsel objected to the admission of the police reports as unreliable hearsay and not admissible under section 6600 and *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). She contrasted the police reports with probation reports, which are subject to correction should a defendant object to the accuracy of their content. The trial court admitted the exhibits into evidence, explaining that the reports were admissible under section 6600, subdivision (a)(3).

### B. *Analysis*

Bocklett contends that the admission of the police reports regarding his 1983 and 1994 qualifying offenses violated his right to due process. He claims that the admission of the police reports was highly prejudicial as these reports provided the only real source of information describing his most recent qualifying offense. Even assuming, without deciding, that admission of the police reports was error, we conclude that the assumed error was harmless.

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] . . . Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subds. (a), (b).) On direct examination, experts may testify regarding the matters on which they relied in forming their opinion, but they may not testify as to the

7

details of such matters if they are otherwise inadmissible. (*People v. Coleman* (1985) 38 Cal.3d 69, 92, disapproved on another point in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.) "The rule rests on the rationale that while an expert may give reasons on direct examination for his opinions, including the matters he considered in forming them, he may not under the guise of reasons bring before the jury incompetent hearsay evidence." (*Coleman*, at p. 92.) We apply "the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question." (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) An error regarding the admission of evidence requires reversal if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

In *Sanchez*, *supra*, 63 Cal.4th 665, our Supreme Court held that an expert cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at p. 686.) The court nevertheless reaffirmed the principle that an "expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so." (*Id.* at p. 685.) The *Sanchez* rule applies to civil SVP proceedings. (*People v. Roa* (2017) 11 Cal.App.5th 428, 448-449*; People v. Burroughs* (2016) 6 Cal.App.5th 378, 403 (*Burroughs*).)

"The existence of any prior convictions [in an SVP proceeding] may be shown with documentary evidence . . . including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the

8

[DSH]." (§ 6600, subd. (a)(3).) Our high court later explained that "[b]y permitting the use of presentence reports at the SVP proceeding to show the details of the crime, *the Legislature necessarily endorsed the use of multiple-level-hearsay statements that do not otherwise fall within a hearsay exception*." (*People v. Otto* (2001) 26 Cal.4th 200, 208 (*Otto*), italics added.) The expansive hearsay exception accorded by section 6600, subdivision (a)(3) was intended to relieve victims of the burden of testifying about the details of crimes committed many years ago. (*Otto*, at p. 208.) The *Otto* court concluded that the statutory authorization regarding the admission of such evidence did not violate a defendant's right to due process. (*Id.* at p. 203.) In *Burroughs*, the court held that police reports were admissible under the *Otto* hearsay exception. (*Burroughs*, *supra*, 6 Cal.App.5th at p. 410.)

Bocklett argues that the analysis in *Burroughs* was flawed. We need not address this issue because, even if the trial court erroneously admitted the police reports, the assumed error was harmless based on the expert testimony that relayed substantially all the conduct stated in the police reports.

First, Bocklett tacitly conceded that admission of the police report regarding his 1983 conviction was harmless. The police report for that crime relayed the victim's statement to his mother that Bocklett had " 'stuck his penis up [my] butt.' " Bocklett, however, admitted this conduct to both Drs. Yanofsky and Goldberg. Bocklett told Dr. Yanofsky that he had engaged in mutual oral copulation with and sodomized the victim. Bocklett admitted essentially the same conduct to Dr. Goldberg.

The 1994 police report for Bocklett's 2000 conviction contains the victim's statement to her mother that Bocklett had touched her private parts while she was naked. She also told the police that she and Bocklett had put their " 'bodies' " and " 'privacies' " together.  Regarding this conviction, Bocklett told Dr. Yanofsky that he rubbed, orally copulated, and digitally penetrated the victim.  He also told Dr. Goldberg that he would have the victim "sit on his lap and rock back and forth, and that led him to other incidents in which he would take his clothes off, would place lotion on [the victim] and fondle and penetrate her vagina, and then he also engaged in acts of oral copulation of her." Bocklett does not contest that these statements were admissible under the hearsay exception for a party admission under Evidence Code section 1220.  (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007-1008.)

Based on this overwhelming admissible evidence of qualifying sexually violent offenses, any error in receiving the police reports in evidence was harmless.  For the same reason, there is no basis for Bocklett's contention that his due process right to a fair trial was violated.

### III.  *ALLEGED CONSTITUTIONAL VIOLATIONS*

A.  *Alleged Equal Protection Violation Regarding Tolling*

1.  *General background*

California provides for the involuntary civil commitment of several classes of offenders, either after or in lieu of a term of criminal incarceration, based on the risk of danger that they present to others or to themselves.  These include SVP's (§ 6600 et seq.) and mentally disordered offenders (MDO's) (Pen. Code, § 2960 et seq. (the MDO Act)).

10

Under the MDO Act, "offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger to society, receive mental health treatment during and after the termination of their parole until their mental disorder can be kept in remission. [Citation.] Although the nature of an offender's past criminal conduct is one of the criteria for treatment as [an MDO], the MDO Act itself is not punitive or penal in nature. [Citation.] Rather, the purpose of the scheme is to provide MDO's with treatment while at the same time protecting the general public from the danger to society posed by an offender with a mental disorder." (*In re Qawi* (2004) 32 Cal.4th 1, 9.)

The MDO Act provides that an MDO may be involuntarily committed at three different stages: as a condition of parole (Pen. Code, § 2962), in conjunction with the extension of parole (Pen. Code, § 2966, subd. (c)), and following release from parole (Pen. Code, §§ 2970 & 2972). (*Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1061-1063, disapproved on other grounds by *People v. Harrison* (2013) 57 Cal.4th 1211, 1230, fn. 2.)

## 2. *Equal protection and the Act*

"Equal protection requires the state to treat similarly situated persons alike, with some exceptions in which the disparate treatment is sufficiently related to the purpose of the [law] in question." (*People v. Jacobs* (1992) 6 Cal.App.4th 101, 103.) The equal protection clause applies to civil commitment statutes "to ensure that a particular group of civil committees is not unfairly or arbitrarily subjected to greater burdens." (*People v. McKee* (2010) 47 Cal.4th 1172, 1199 (*McKee I*).) The similarly situated inquiry

11

examines whether two groups are similarly situated for purposes of the law challenged, not whether they are similarly situated for all purposes. (*Id.* at p. 1202.) The threshold question is "whether two classes that are different in some respects are sufficiently similar with respect to the laws in question to require the government to justify its differential treatment of these classes under those laws." (*Ibid.*) "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold." (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155.)

The *McKee I* court concluded that MDO's and SVP's were similarly situated for purposes of equal protection analysis regarding the length of their commitment and the burden to prove release. (*McKee I*, *supra*, 47 Cal.4th at pp. 1202-1203.) The case was remanded to the trial court to determine whether the People could demonstrate "the constitutional justification" (*id.* at p. 1208) for the indefinite commitment provisions of the Act and imposing on SVP's a greater burden than is imposed on MDO's in order to obtain release from commitment. (*McKee I*, at pp. 1208-1209.)

On remand, the trial court in *McKee I*, *supra*, 47 Cal.4th 1172 held an evidentiary hearing and then issued a statement of decision finding that the People established, by a preponderance of the evidence, that the disparate treatment of SVP's "under the Act was based on a reasonable perception of the greater and unique dangers they pose compared to" MDO's. (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1332 (*McKee II*).) On review, the appellate court affirmed the trial court's decision: "We, like the trial court, conclude the disparate treatment of SVP's under the Act is reasonable and factually based and was adequately justified by the People at the evidentiary hearing on remand.

12

Accordingly, we conclude the Act does not violate McKee's constitutional equal protection rights." (*McKee I*, at p. 1348.) The Supreme Court denied review of *McKee II*.

3. *Additional background*

Under the current version of Penal Code section 3000(a)(4), persons undergoing the commitment process as an SVP and persons committed as an SVP have their parole periods tolled until they are discharged from their SVP commitment. (Pen. Code, § 3000(a)(4)(A).) If the person is ultimately determined not to be an SVP, the parole period is retroactively untolled and the person gets credit for the entire time spent in custody as a prospective SVP. (Pen. Code, § 3000(a)(4)(B).)

In contrast, under the MDO Act a state prisoner may be civilly committed for involuntary treatment as a condition of parole if statutorily enumerated criteria are met. (Pen. Code, §§ 2962, 2966.) If the state wishes to continue the committee's involuntary treatment past the expiration of his or her period of parole, the appropriate district attorney must file a petition in the superior court and prove at a hearing that the person continues to qualify for involuntary treatment, in which case treatment will be continued for one year, unless extended again under the same process. (Pen. Code, §§ 2970, 2972.)

4. *Analysis*

Bocklett argues that Penal Code section 3000(a)(4), which tolls the parole period for an SVP, violates his right to equal protection because he is similarly situated to MDO's who do not have a similar tolling provision. Bocklett concedes that he failed to raise this issue below, but claims it is cognizable on appeal because he was not adversely

13

affected by the statutory provisions until he was actually committed as an SVP; thus, there was no point in raising the issue in the trial court. If we determine that trial counsel should have raised this issue, then he claims counsel provided ineffective assistance by failing to do so.

The People respond that we should decline to address Bocklett's equal protection argument because the issue is not ripe for review. Assuming the issue is ripe for adjudication, the People claim Bocklett forfeited the issue by failing to raise it once the trial court concluded that he met the SVP criteria.

For the sake of argument, we assume that the People's ripeness challenge to this argument is not well taken. We also exercise our discretion to address the argument on its merits to avoid Bocklett's alternative ineffective assistance of counsel claim. (*In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1323 [we "have discretion to address constitutional issues" raised for the first time on appeal].) Because we find no equal protection violation, we will assume, without deciding, that these two groups are similarly situated for purposes of the restrictions to be placed upon them when they are returned to the community post-commitment and proceed to the second step of the equal protection analysis. (*Id.* at p. 1325.)

Once it is determined that two groups are similarly situated for the purposes of a statute, we next must determine what level of analysis to apply to the distinction. Bocklett asserts that strict scrutiny is the correct standard for disparate involuntary civil commitment schemes because liberty is a fundamental right. The People disagree, arguing that rational basis review applies because the Penal Code section 3000(a)(4)

14

tolling provisions applicable to SVP's do not significantly infringe upon a fundamental right. The People, however, also analyze the issue under the strict scrutiny standard. We need not dwell on this issue because, as we shall explain, Bocklett's disparate treatment argument fails under the strict scrutiny standard.

Under "the strict scrutiny standard, the state has the burden of establishing it has a compelling interest that justifies the law and that the distinctions, or disparate treatment, made by that law are necessary to further its purpose. [Citation.] Alternatively stated, applying the strict scrutiny standard, a law 'is upheld only if it is necessary to further a compelling state interest.' " (*McKee II*, *supra*, 207 Cal.App.4th at p. 1335.)

We conclude that California has shown a compelling interest to toll the parole period for SVP's so that SVP's receive parole supervision after they have been fully discharged from their commitment. Notably, this is not a situation where MDO's are treated differently. Rather, it is a legal impossibility to toll the parole period for an MDO because mental health treatment for an MDO is imposed as a condition of parole. (Pen. Code, §§ 2962, 2966.)

On its original enactment, the Act "narrowly target[ed] 'a small but extremely dangerous group of [SVP's] that have diagnosable mental disorders [who] can be identified while they are incarcerated.' " (*Cooley v. Superior Court, supra,* 29 Cal.4th at p. 253.) In *McKee II*, the court concluded "that the nature of the trauma caused by sex offenses is generally more intense or severe than the trauma caused by nonsex offenses and is sometimes unique to sex offenses" (*McKee II, supra,* 207 Cal.App.4th at p. 1343), and thus substantial evidence supported "a reasonable perception by the electorate, as a

15

legislative body, that the harm caused by child sexual abuse and adult sexual assault is, in general, a greater harm than the harm caused by other offenses and is therefore deserving of more protection." (*Id.* at pp. 1343-1344.) Additionally, SVP's "pose a higher risk of sexual reoffending than do MDO's." (*Id.* at p. 1342, italics omitted.) While MDO's are "overwhelmingly treated with psychotropic medications, resulting in their stabilization and amenability to psychosocial support" (*id.* at p. 1344), SVP "treatment plans are not based on medications, but rather on giving them the tools to limit their risk of sexually reoffending." (*Id.* at p. 1345.) " '[A]s a class, SVP's are clinically distinct from MDO's . . . and . . . those distinctions make SVP's more difficult to treat and more likely to commit additional sexual offenses than . . . MDO's . . . .' In particular, SVP's are less likely to participate in treatment, less likely to acknowledge there is anything wrong with them, and more likely to be deceptive and manipulative." (*Id.* at p. 1347.)

The Legislature added the current version of the tolling provision to the Act by amendment (the 2011 Amendment). (Stats. 2011, ch. 359, § 3, operative Jan. 1, 2012.) Before the 2011 Amendment, Penal Code section 3000 provided that " 'the parole period of any person found to be a [SVP] shall be tolled until that person is found to no longer be [an SVP], at which time the period of parole, or any remaining portion thereof, shall begin to run.' " (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 179 (2011-2012 Reg. Sess.) July 5, 2011, p. 2.) The amendment was drafted to "close[] a loophole in the law to ensure that sex offenders serve their court-ordered parole time. It does not expand or extend parole—it simply corrects the timing of the parole. [¶] Due to an inconsistency in the law, the parole time for these offenders begins as soon as they are

16

released from prison, and continues while the offender is being assessed in the state hospital under full security—thus receiving overlapping supervision services. As a consequence, some offenders run out the clock on their three year court-ordered parole time and are released into the community with no supervision—contrary to the intent of the law. [¶] [This bill] would instead require that the parole time occur after the offender is released from hospital custody." (*Ibid.*) An argument made in support of the bill noted that " '[u]nder current law, the parole period begins to run as soon as the offender is released from prison. This means that an offender believed to be an SVP can effectively complete his or her mandated parole period while confined in a state mental hospital awaiting an often delayed judicial determination of SVP status. As a result, offenders can be released into community with no supervision upon release from the state mental hospital.' " (*Id.* at p. 4.)

Bocklett does not address these concerns. Rather, Bocklett challenges the parole tolling provision that applies to SVP's, arguing that it does not serve a compelling governmental interest for SVP's to remain on parole after they have been fully discharged from their commitment. He maintains that once an SVP has been unconditionally discharged, the person is no longer an SVP and thus the risks identified in *McKee II* are no longer present. We disagree.

The Legislature pointed out that the tolling provision impacts when parole starts; it does not change the length of time an SVP spends on parole. Before the amendment at issue, parole started immediately when an individual's prison sentence ended, before the individual was even determined to be an SVP. Due to the time needed to adjudicate an

17

individual as an SVP, the individual's parole period could expire before the person was even adjudicated an SVP. Thus, an individual could be released into the community from SVP commitment with no parole supervision.

The evidence presented in *McKee II* shows a compelling governmental interest exists for SVP's to receive parole supervision after they have been fully discharged from their commitment. The clinical distinctions between SVP's and MDO's "make SVP's more difficult to treat and more likely to commit additional sexual offenses than [] MDO's." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347.) Critically, an SVP poses a higher risk of sexual reoffending than does an MDO. (*Id.* at p. 1342.) Although an SVP committee who is unconditionally discharged from custody is deemed not "likely" to reoffend (§ 6600, subd. (a)(1)), this does not mean that the individual poses no risk of reoffending. The risk of reoffense, " 'to a particularly vulnerable class of victims, such as children' " (*McKee II*, at p. 1347), justifies the requirement that a discharged SVP committee receive parole supervision. (*Ibid*.) Accordingly, we conclude that the tolling provision of the Act does not violate Bocklett's constitutional equal protection rights.

B. *Alleged Equal Protection Violation Regarding Conditional Release*

1. *Additional background*

a. The MDO Act

Under the MDO Act, a state prisoner may be civilly committed for involuntary treatment as a condition of parole if statutorily enumerated criteria are met. (Pen. Code, §§ 2962, 2966.) When MDO treatment is ordered as a condition of parole, the treatment must be inpatient "unless the [DSH] certifies to the Board of Parole Hearings that there is

18

reasonable cause to believe the parolee can be safely and effectively treated on an outpatient basis, in which case the Board of Parole Hearings shall permit the [DSH] to place the parolee in an outpatient treatment program specified by the [DSH]." (Pen. Code, § 2964, subd. (a).)

If the state wishes to continue the involuntary treatment of an MDO past the expiration of parole, the state must file a petition in the superior court and prove at a hearing that the person continues to qualify for involuntary treatment, in which case treatment will be continued for one year, unless extended again under the same process. (Pen. Code, §§ 2970, 2972.) Where treatment has been continued, the court "has authority to release the MDO for outpatient treatment so long as it finds 'there is reasonable cause to believe that the committed person can be safely and effectively treated on an outpatient basis.' " (*People v. May* (2007) 155 Cal.App.4th 350, 359, citing Pen. Code, § 2972, subd. (d).) The statutory language of "reasonable cause to believe" requires the patient to "raise a strong suspicion in a person of ordinary prudence that outpatient treatment would be safe and effective." (*People v. Gregerson* (2011) 202 Cal.App.4th 306, 319.) This is similar to the "probable cause" standard imposed on the prosecution at a preliminary hearing. (*Id.* at pp. 318-319.)

b. The Act

Three routes exist for an SVP to qualify for placement in an outpatient treatment program. First, the director of DSH (the Director) "shall authorize the person to petition the court for conditional release to a less restrictive alternative" (§ 6604.9, subd. (d)) if the DSH determines in its annual report that "conditional release to a less restrictive

19

alternative is in the best interest of the person and conditions can be imposed that adequately protect the community." (*Id.* at subds. (d), (a).) Second, after a year of commitment in a facility designated by the Director, an SVP is permitted to petition the court for conditional release without the permission of the DSH. (§ 6608, subd. (a), (f).) If a patient files a petition for conditional release, the patient is required to prove, by a preponderance of the evidence, his or her suitability for conditional release. (§ 6608, subd. (k).)

Finally, the Director may forward a report and recommendation for conditional release under section 6608 when the Director "determines that the person's diagnosed mental disorder has so changed that the person is not likely to commit acts of predatory sexual violence while under supervision and treatment in the community." (§ 6607, subd. (a).) If the Director makes this determination, the Director forwards "a report and recommendation for conditional release in accordance with Section 6608 to the county attorney designated in subdivision (i) of Section 6601, the attorney of record for the person, and the committing court." (§ 6607, subd. (a).) When such a report and recommendation is filed, the court must "set a hearing in accordance with the procedures set forth in Section 6608." (§ 6607, subd. (b).)

2. *Analysis*

Bocklett asserts that the Director is ignoring the duty under section 6607 to recommend conditional release and that this portion of the Act violates equal protection. As support for this contention, Bocklett notes that a California Public Records Act request revealed that from 2006 to the present only 17 people have been recommended

for release by the treatment staff to the Director and in each of those cases the Director failed to recommend release. Bocklett claims that disparate treatment exists because MDO's are routinely released from custody into conditional release under favorable terms, but SVP's almost never are released.[2] The People respond that this claim is not ripe for review. We agree.

"It is well-settled law that the courts will not give their consideration to questions as to the constitutionality of a statute unless such consideration is necessary to the determination of a real and vital controversy between the litigants in the particular case before it. It is incumbent upon a party to an action or proceeding who assails a law invoked in the course thereof to show that the provisions of the statute thus assailed are applicable to him and that he is injuriously affected thereby." (*People v. Perry* (1931) 212 Cal. 186, 193; *People v. Williams* (1966) 247 Cal.App.2d 169, 170; see *People v. Carroll* (2007) 158 Cal.App.4th 503, 508, fn. 2 [declining to issue advisory opinion as to constitutionality of Act provision that did not apply to decision under review].)

We decline to issue an advisory opinion on the issue whether the Director should have forwarded a report and recommendation for Bocklett's conditional release in accordance with section 6608 because Bocklett failed to make a threshold factual showing that his "diagnosed mental disorder has so changed that [he] is not likely to

[2] Bocklett requests that we take judicial notice of the relatively low rate at which the DSH approves persons committed as SVP's for release as support for his argument that there are constitutional flaws in the current version of section 6608. The People oppose the request on the ground that the documents were never presented to the trial court. The request for judicial notice is denied because Bocklett has failed to explain why this new evidence was never offered to the trial court in a motion for new trial. (*Estate of Schluttig* (1950) 36 Cal.2d 416, 423.)

21

commit acts of predatory sexual violence while under supervision and treatment in the community" as required by subdivision (a) of section 6607. Because Bocklett is appealing from his initial SVP commitment order and he has not challenged the sufficiency of the evidence supporting this commitment, Bocklett cannot make this showing as a matter of law. Moreover, Bocklett may not raise equal protection claims of other hypothetically disadvantaged SVP committees as a basis to invalidate the statute's application to the circumstances of his case. (*People v. Garcia* (1999) 21 Cal.4th 1, 11-12 [whether statute had hypothetical potential for equal protection violation "must await a case in which it is actually presented"].)

Bocklett also asserts that the Act violates equal protection because MDO's are immediately eligible for conditional release following their commitment, whereas SVP's must wait a year after commitment to file a petition (§ 6608, subd. (f)), and a new petition cannot be filed until a year after the prior petition has been denied. (*Id.* at subd. (j).) We shall assume, without deciding, that this argument is ripe for review because it is easily disposed of under *McKee I* and *McKee II*. Both decisions considered in their equal protection analyses the disparate treatment of SVP's resulting from the requirement that under the Act the SVP be committed for an indeterminate commitment period. (*McKee I*, *supra*, 47 Cal.4th at p. 1203; *McKee II*, *supra*, 207 Cal.App.4th at p. 1347.)

Again, the *McKee II* court found that the People had presented evidence showing that (1) the inherent nature of the mental disorder of SVP's makes recidivism significantly more likely as a class than for MDO's (*McKee II*, *supra*, 207 Cal.App.4th at p. 1340); (2) victims of sex offenses suffer unique and generally greater trauma than victims of nonsex

22

offenses (*id.* at p. 1342); and (3) SVP's are significantly different from MDO's in terms of diagnosis and treatment (*id.* at p. 1344). The *McKee II* court also rejected the defendant's argument that the Act was unconstitutional unless it adopted the least restrictive means available to further the state's compelling interests. (*McKee II*, at pp. 1348-1349.) The court stated: "We are unpersuaded the electorate that passed Proposition 83 in 2006 was required to adopt the least restrictive means available (e.g., a two-year or other determinate term of civil commitment) in disparately treating SVP's and furthering the compelling state interests of public safety and humane treatment of the mentally disordered." (*Id.* at p. 1349.)

Bocklett's argument that *immediately* upon his initial commitment he should be allowed to petition for release, rather than wait a year, is simply a repackaging of the argument rejected in *McKee II* that a less restrictive means existed (e.g., a shorter commitment term, such as immediate release) to further "the compelling state interests of public safety and humane treatment of the mentally disordered." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1349.) Applying the reasoning in *McKee II*, we conclude that the one-year waiting period is necessary to further the compelling state interest in providing treatment to SVP's and protecting the public, and that there is no less burdensome alternative to effectuate those interests. Accordingly, we conclude that the one-year waiting periods in the Act do not violate Bocklett's constitutional equal protection rights.[3]

---

[3] Although not entirely clear, Bocklett appears to also claim that SVP's and MDO's are subject to disparate treatment regarding either the burden of proof to obtain

23

D. *Alleged Ex Post Facto Violation Regarding Tolling*

1. *Additional background*

As originally enacted effective September 13, 1996, Penal Code section 3000(a)(4) provided: "Any finding made pursuant to [the Act], that a person is a [SVP] shall not toll, discharge, or otherwise affect that person's period of parole." (Pen. Code, § 3000(a)(4), as enacted by Stats. 1996, ch. 462, § 3, eff. Sept. 13, 1996.)

Effective September 20, 2006, the Legislature amended Penal Code section 3000(a)(4) to provide: "For any person being evaluated as [an SVP] pursuant to [the Act], parole shall toll from evaluation through the period of commitment, including conditional release under court monitoring, if any. The period during which parole is tolled shall include the filing of a petition for commitment, hearing on probable cause, trial proceedings, actual commitment, and any time spent on conditional release under court monitoring. . . . Time spent on conditional release under the supervision of the court shall be subtracted from the person's period of parole." (Pen. Code, § 3000(a)(4), as amended by Stats. 2006, ch. 337, § 45, eff. Sept. 20, 2006.)

Effective November 8, 2006, the statute was amended by the voters to provide: "The parole period of any person found to be [an SVP] shall be tolled until that person is found to no longer be [an SVP], at which time the period of parole, or any remaining

---

conditional release, or what must be proven to obtain conditional release. We conclude either argument is not ripe for review because Bocklett has not filed a petition for conditional release under section 6608. Thus, the question whether he is disadvantaged as compared to an MDO, by what he is required to show or how he must make the showing, seeks an advisory opinion based on hypothetical facts, which we are not permitted to render.

24

portion thereof, shall begin to run."  (Pen. Code, § 3000(a)(4), as amended by Prop. 83, § 17, eff. Nov. 8, 2006.)

Penal Code section 3000(a)(4), was amended in 2011, effective January 1, 2012. (Cal. Const., art. IV, § 8, subd. (c)(1) [statutes enacted at a regular session go into effect on Jan. 1 of the following year].)  As amended, the statute tolls the period of parole for a person subject to SVP proceedings upon a finding of probable cause rather than upon a finding that the person is actually an SVP.  (Pen. Code, § 3000(a)(4), as amended by Stats. 2011, ch. 359, § 1.5.)  At the same time, Penal Code section 3000, subdivision (a)(5), was added to provide as follows:  "Paragraph (4) applies to persons released by the Department of Corrections and Rehabilitation on or after January 1, 2012.  Persons released by the Department of Corrections and Rehabilitation prior to January 1, 2012, shall continue to be subject to the law governing the tolling of parole in effect on December 31, 2011."  (Pen. Code, § 3000, subd. (a)(5), as added by Stats. 2011, ch. 359, § 1.5, eff. Jan. 1, 2012.)

2. *Analysis*

Bocklett argues that the current version of Penal Code section 3000(a)(4), rather than the initial version enacted alongside the Act in 1996, violates his right to be free from ex post facto laws under the California and United States Constitutions.  The People argue this claim is not ripe because Bocklett will not be aggrieved by the operation of this statute unless he is found to no longer meet the criteria for commitment as an SVP, granted his unconditional discharge from DSH, and released on parole.  Assuming the claim is ripe, the People contend Bocklett forfeited the claim by not raising it below.  For

25

purposes of analysis, we assume, without deciding, that Bocklett's claim is ripe for review and we exercise our discretion to address the issue on its merits.

The federal and state ex post facto clauses (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9) prohibit legislation " 'which makes more burdensome the punishment for a crime, after its commission . . . .' " (*Collins v. Youngblood* (1990) 497 U.S. 37, 42 (*Collins*); *People v. McVickers* (1992) 4 Cal.4th 81, 84.) The ex post facto prohibition is intended to ensure that individuals have " 'fair warning' about the effect of criminal statutes [and] 'restricts governmental power by restraining arbitrary and potentially vindictive legislation.' " (*Landgraf v. USI Film Products* (1994) 511 U.S. 244, 267.) "The ex post facto clause prohibits only those laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.' " (*McKee I*, *supra*, 47 Cal.4th at p. 1193.)

In *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138 (*Hubbart*) our high court addressed whether commitment of a prisoner under the Act violated the ex post facto prohibition if it was based on sexually violent offenses committed before the effective date of the Act. (*Hubbart*, at p. 1171 ["The basic issue raised by [the prisoner was] whether the [Act] inflicts 'punishment' within the meaning of *Collins*, *supra*, 497 U.S. 37, 43."].) The *Hubbart* court held that "the [Act] does not 'affix culpability' or seek 'retribution' for criminal conduct" (*Hubbart*, at p. 1175), and rejected a prisoner's ex post facto argument. (*Ibid.*; see also *McKee I*, *supra*, 47 Cal.4th at pp. 1193-1195 [rejecting an ex post facto challenge to Act amendments modifying rules for release from commitment].) A judicial determination that a law is not punitive "removes an essential

26

prerequisite for. . . .ex post facto claims." (*Kansas v. Hendricks* (1997) 521 U.S. 346, 369.)  Since the Act is not punitive in nature, the constitutional provisions prohibiting ex post facto laws are inapplicable.

Moreover, Bocklett committed his latest offense in 1994, but the Act and Penal Code section 3000(a)(4) were not enacted until 1996.  (*Hubbart*, *supra*, 19 Cal.4th at p. 1143; Pen. Code, § 3000(a)(4), as enacted by Stats. 1996, ch. 462, § 3, eff. Sept. 13, 1996.)  Accordingly, because the Act did not exist at the time of Bocklett's offenses he was not subject to any increase in punishment based upon the tolling provision in the most recent version of the law as this provision is "clearly intended to operate and protect the public *in the present*, not to serve as additional punishment for past crimes." (*In re E.J.* (2010) 47 Cal.4th 1258, 1278, 1279-1280 [application of residency restrictions under Penal Code section 3003.5 to individuals released on parole after effective date of law does not violate ex post facto laws].)  For this reason, we hold that application of the law here did not impose any unconstitutional, increased punishment on Bocklett.

DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:

HUFFMAN, Acting P. J.

GUERRERO, J.