Filed 2/25/21  P. v. Ding CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C082704 |
| Plaintiff and Respondent, | (Super. Ct. No. SCV0036682) |
| v. | |
| GREGORY SCOTT DING, | |
| Defendant and Appellant. | |

As defendant Gregory Scott Ding was nearing the end of his state prison term for the crimes of lewd act on a child (Pen. Code, § 288, subd. (a)) and attempted lewd act on a child (Pen. Code, §§ 664, 288, subd. (a)), the People filed a petition to commit him to the custody of the Department of State Hospitals (DSH) as a sexually violent predator (SVP) pursuant to the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code,

1

§ 6600 et seq).[1]  The two state psychologists evaluating defendant initially disagreed as to whether he was an SVP, as did the two independent psychologists who subsequently examined him.  The petition for his commitment was not filed until after the state psychologist who initially found him not to be an SVP filed an addendum changing his findings and concluding defendant was an SVP.  During the court trial, which was held shortly before the California Supreme Court issued a decision significantly limiting the use of hearsay in expert opinion testimony, the expert witnesses all relied on case-specific hearsay statements in their testimony.

Defendant appeals from the trial court's judgment committing him as an SVP.  He contends the People did not have authority to file the SVP petition, improperly admitted case-specific hearsay warrants reversal, trial counsel was ineffective in failing to object to portions of the probation report from his qualifying convictions, counsel was ineffective by providing no effective defense, and cumulative error warrants reversal.  In a supplemental brief, he contends a provision in Penal Code section 3000 tolling the parole period for an SVP violates equal protection and constitutes an ex post facto punishment.  We find the petition was authorized, the hearsay error was harmless, counsel was not ineffective in declining to object to the probation report and did not fail to provide an effective defense.  We also find no equal protection or ex post facto problems with tolling his parole.  As there were no errors other than the harmless hearsay error, cumulative error does not justify reversal.  We affirm.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

BACKGROUND

*Prosecution Case*

      1. *Dr. Maram*

DSH psychologist, Dr. Wesley Maram, interviewed defendant for about two hours and reviewed various documents related to his criminal history. Defendant committed his first offense in 1981 when he was 17 years old by exposing himself to a child. Defendant denied being arrested on that charge, claiming he was arrested for theft. Dr. Maram was provided with a police report of the incident after he finished the evaluation. According to the report, defendant was riding a bicycle when he saw an eight-year-old girl, turned the bicycle around, and exposed himself to her. Defendant asked the girl if she knew what "it" was; when she said no, defendant told her it was his penis and then rode off. This led Dr. Maram to conclude defendant had pedophilia since his teenage years.

Dr. Maram asked defendant about a 2006 offense where he exposed himself to a female in a women's restroom. Defendant said he did not remember the event as he was drunk and did not know what was going on. Dr. Maram found it significant defendant avoided acknowledging his "sexual deviant problems." Defendant was also inconsistent and deceptive with Dr. Maram and other evaluators.

Dr. Maram reviewed a probation report regarding a series of offenses committed by defendant against female minors in 2009 and 2010. The first incident involved a 10-year-old girl who was walking about defendant's home when he picked her up and put his hand under her skirt and on her buttocks. The girl left and returned later that day, at which point defendant put the girl on his lap and put his hand on her vagina, over her clothing. It was significant that defendant's behavior had escalated from exposing himself. These offenses were predatory since the victim was a stranger to defendant. When asked about the incidents, defendant replied that the girl was more sophisticated

3

and mature than you expect from a 10 year old. This statement was typical of a child molester.

Defendant had an incident with another girl in 2009; he and his family were friends with this girl's family. Her father saw her put her hands on her vaginal area while she was sitting on defendant's lap, which was a form of grooming behavior. Another time, a different family member walked into the kitchen and saw defendant with his hands on the girl's vagina. When the family member walked in, defendant quickly moved his hands away, as if he had been caught. Defendant did not admit anything specific to the girl's parents but did apologize to them.

Defendant also had a peeping Tom incident with this girl in 2010 where he was drunk, in the backyard, and had a ladder with him. The fact that defendant was in the girl's backyard even though he previously apologized to her family showed a lack of control over his urges. Defendant said the incident was fabricated. He told the probation officer that he needed sex offender and alcohol offender treatment.

The details of the last incident, in June 2010, were taken from a police report. Defendant was intoxicated and at a swimming pool where families were present. He had a six-year-old girl hold a hose at his exposed genitalia. This was a very specific pedophiliac act. In a 2010 evaluation by another psychologist, a Dr. Nelson,[2] defendant, when asked what happened, claimed not to remember the incident and "intoxication was what occurred." When Dr. Maram asked him about the incident, defendant replied, "I acted inappropriately when I asked the girl to rinse me off in the shower."

Defendant admitted to Dr. Nelson there had been a second incident at the same pool. Dr. Maram found it significant that defendant continued to expose himself to

---

[2]     Defendant was evaluated in 2010 by a "Dr. Nelson." The testifying experts read Dr. Nelson's report and refer to it in their testimony. References to the 2010 evaluation or to Dr. Nelson are to this evaluation and evaluator.

children in a place where others could easily observe him. This indicated defendant's judgment was impaired and defendant was out of control.

Dr. Maram found other statements made by defendant in the 2010 examination to be significant. Defendant told Dr. Nelson he had been sexually attracted to children since he was a teenager. Defendant told Dr. Maram he was not sexually attracted to children. Confronted with his statement from the 2010 evaluation, defendant claimed Dr. Nelson in effect put words into his mouth. Other significant statements from defendant in the 2010 report were his acknowledging that he needed help and that he had tried to change and control his thoughts by thinking of having sex with his spouse. These statements reinforced the conclusion that defendant had difficulty controlling his behavior.

Dr. Nelson administered the MCMI 3, a personality inventory, to defendant. Defendant made statements reflecting immaturity and difficulty with impulse control. Dr. Maram agreed with Dr. Nelson that defendant was out of control toward children at the time of his 2010 evaluation.

Dr. Maram diagnosed defendant as suffering from a pedophilic disorder, with an attraction to females, but he was not attracted to children exclusively. Defendant also suffered from an exhibitionism disorder, was sexually aroused by exposing his genitalia to children and adults in a controlled environment, had persistent depressive disorder, severe alcohol use disorder, moderate cannabis use disorder, and unspecified personality disorder. He also suffered from impaired volitional or emotional control.

Defendant had a low score of 11 on the Hare Psychopathy Checklist. He scored five on the Static-99R, which showed a five-year risk of reoffending at 16 percent. Dr. Maram also administered the Structured Risk Assessment-Forensic Version, which showed defendant falling in the routine group of sex offenders regarding the likelihood of reoffending. He had a score of two, the highest possible score in sexual preference for children and showed an elevated sexual interest. This showed any reoffense would be toward children.

5

Dr. Maram found no factors that would reduce defendant's risk of reoffending if released. Defendant told Dr. Maram that he did not have a sexual problem and his problem was substance abuse. He did not acknowledge having committed any sexual offenses, claiming that they were fabricated or lies and that he could not remember and was intoxicated. Defendant said nothing to indicate he would voluntarily pursue sex offender treatment, which was consistent with his claims of not having a sexual problem.

Dr. Maram concluded defendant was likely to commit another sex offense and therefore required custody and treatment.

2. *Dr. Vorwerk*

DSH psychologist, Dr. Michelle Vorwerk, interviewed defendant in prison, but he terminated the interview after roughly 40 minutes. Her evaluation of defendant was based on her review of numerous documents including police reports, the probation report, and the criminal records associated with his case. She reviewed a 1981 and 2010 police report after making her recommendation, but these reports did not change her conclusions.

Defendant committed his first offense when he was 17 years old and had been in a controlled environment since July 4, 2010. He was married at the time of the qualifying convictions, which showed he would commit a sexual offense against a child even when an adult sexual partner was available. Defendant denied fantasizing about children. When confronted by a contrary statement he made during the 2010 evaluation, defendant continued to deny and claimed the doctors then made up things and put words into his mouth. Admitting sexual fantasies to one evaluator while denying them to another was a red flag.

Defendant terminated the interview when Dr. Vorwerk started to ask him about sexual topics such as masturbation. His unwillingness to discuss topics like his sexual preferences and interests was concerning, as it suggested he would be unwilling to discuss such topics with others in a treatment setting.

Defendant attributed his sex offenses to having been intoxicated. His unwillingness to take responsibility for the sex crimes was further reason to believe he lacked the understanding and awareness to participate in treatment.

Dr. Vorwerk recounted details of the 1981 as well as the 2009 and 2010 incidents. Dr. Vorwerk found the repetitive nature of these incidents showed defendant's lack of control over his actions. The predatory nature of the offenses was shown by the fact that most of defendant's victims were strangers.

Dr. Vorwerk found the previously administered MCMI 3 showed defendant had difficulty controlling his impulses. She also found it significant that defendant had admitted having a sexual interest in children during the 2010 evaluation. At that time defendant said he was considering castration, but he never went through with it. Defendant also acknowledged in the probation report that he needed sex offender treatment.

Defendant denied to Dr. Vorwerk that he ever hurt anyone. Asked if he was sexually attracted to children, defendant replied he never had any thoughts about that. Defendant's unwillingness to discuss his mental disorder or take responsibility for it indicated he was unlikely to seek out treatment in the community on his own. The fact that he was on probation for driving under the influence at the time of his offense against the 10-year-old girl showed putting defendant on some sort of supervision does not deter him.

Defendant suffered from pedophilic disorder and exhibitionistic disorder, as well as alcohol use disorder and cannabis use disorder. Pedophilic disorder cannot be cured but can only be "treated and controlled if the person has an adequate level of insight and is fully engaging in treatment and doing other things to control it."

Defendant initially scored four on the Static 99-R, but after receiving the police report from the 1981 offense confirming he had been arrested for the incident, Dr. Vorwerk raised his score to five. This showed a moderate to high level of risk, with a

7

13.8 to 16.6 percent chance of reoffending. Dynamic factors increasing the risk of reoffending included his being found with child pornography and bestiality pornography, having difficulty maintaining relationships, and his drug and alcohol problems. There were no dynamic factors that reduced his risk of reoffending.

Dr. Vorwerk found defendant presented a serious risk of reoffending due to his mental disorders, the number of sexual offenses that have occurred, and his risk assessment scores. She concluded defendant could not be released safely to outpatient treatment as he was unable to control his volitional and emotional impairment and showed a lack of insight and unwillingness to engage in treatment.

3. *Dr. Owen*

Dr. Robert Owen, a psychologist contracted by DSH to perform SVP evaluations, evaluated defendant, who declined to be interviewed.

Dr. Owen initially concluded defendant did not qualify as an SVP. At the time, he had not reviewed the 1981 police report of defendant exposing himself to a girl during a bicycle ride, the 2006 police report regarding exposing himself in a women's restroom, the 2009 through 2010 police reports, or the 2010 psychological evaluation. Reviewing these documents led Dr. Owen to change his opinion and conclude defendant met the criteria for an SVP.

Dr. Owen originally diagnosed defendant with pedophilic disorder. The review of the additional documents led to the added diagnosis of alcohol use disorder and possibly exhibitionism disorder. Defendant originally scored four on the Static 99-R, but after the new documents confirmed defendant's adjudication on the 1981 and 2006 sex offenses, Dr. Own rescored him with a five. This increased the risk of reoffending from 11 percent to 15.2 percent. Another factor changing his opinion was learning that defendant had expressed a sexual interest in children to Dr. Nelson. Defendant's crimes were predatory as he did not know most of his victims; he did not have a close, family-type relationship with those he knew.

8

In making his initial evaluation, Dr. Owen found defendant was not motivated to seek sex offender treatment because he had not sought it even though he recognized he had a problem. It was a "positive thing" that defendant subsequently said he would seek treatment, but there was "too much sexual pathology there" for him to safely seek outpatient treatment.

Dr. Owen concluded that defendant was likely to commit a new sexually violent offense without appropriate treatment in a secure facility.

4. *Dr. Hupka*

Dr. John Hupka, a contract psychologist for DHS, interviewed defendant for about an hour and reviewed records of his mental health treatment in prison and some criminal records.

Defendant claimed not to remember the crimes because he was drunk at the time, and attributed his offenses to alcohol abuse. He denied any sexual attraction to children and blamed it on alcohol abuse. He took little responsibility for his abuse of alcohol and drugs.

Dr. Hupka initially concluded defendant did not meet the SVP criteria but changed his opinion and prepared an addendum report about three to four weeks later. His opinion changed after reading the 2010 evaluation, which provided significant background and history related to defendant's sexual inclinations. As an example, while defendant told Dr. Hupka he was arrested at the age of 16 for urinating in public, the 2010 evaluation said defendant was arrested in 1981 at the age of 16 for exposing himself to a young girl during a bicycle ride. Dr. Hupka found defendant was more open with Dr. Nelson in 2010 than with him, telling Dr. Nelson that he had been struggling with sexual urges toward children for much of his life. This was significant, as giving different descriptions of his criminal history to different evaluators would complicate the task of determining the appropriate treatment for defendant.

9

Dr. Hupka originally diagnosed defendant with alcohol, marijuana, and Ambien abuse, but the addendum report added a diagnosis of pedophilia with an attraction to prepubescent females. The fact that defendant repeatedly committed sexual offenses against children led Dr. Hupka to find he suffered from volitional impairment. Since his prior offenses were against strangers or those with whom he did not have a substantial relationship, future victims would most likely be strangers to him as well.

Defendant originally scored a four on the Static 99-R, showing a moderate risk of reoffending. After the 1981 offense was taken into account, defendant scored a five, placing him in "the moderately high risk range." Defendant scored an eight on the Static 2002-R, a moderately high risk of reoffending. The fact that defendant violated probation in the past called into question whether he would cooperate with supervision in the future. Although defendant abstained from alcohol in prison, he had a history of relapsing when in the community, even with treatment. This raised a significant risk that defendant would return to substance abuse if released.

Dr. Hupka concluded defendant was likely to commit a sexually predatory offense without treatment in a secure facility. His substance abuse and pedophilia were too severe to be addressed through voluntary treatment.

*Defense*

Dr. Gerry Blasingame, a licensed marriage and family therapist, interviewed defendant for five hours at the behest of the defense.

Dr. Blasingame administered numerous tests on defendant, which provided insight into how a person thinks and relates to people. One of those tests, the Jesness Inventory, showed defendant conformed to the rules and authority structure around him. The Carlson Psychological Survey indicated defendant's primary issues were drug and alcohol related. Another test, the Paulhus Deception Scales, seemed to show defendant tried to make people like and think well of him, but he did not have an inflated view of himself. A sexual habits, obsessions, and experiences survey revealed defendant was not

10

having current sexual or deviant thoughts, although defendant's disclaiming ever having any sexual thoughts toward children was disconcerting as it conflicted with the official record. Nonetheless, people in denial can still be treatable. Another test, the ABEL assessment, showed defendant's primary sexual interests were in adult and adolescent females with a somewhat elevated interest in prepubescent girls. The results of the ABEL test indicated a moderate risk of reoffending.

Defendant scored an 11 on the Hare Psychopathy Checklist, putting him at a low to moderate risk of reoffense. Taking the 1981 juvenile offense into account, defendant scored a five on the Static 99-R, putting him in the moderate to high risk group, with about a 25 percent chance of committing another offense within five years of release. His score of 11 on the Stable 2007 put him at the end of the moderate group regarding needs that drive sexual offending.

Dr. Blasingame diagnosed defendant as suffering from pedophilia and exhibitionism. He also had a chronic history of drug and alcohol abuse, and their use was strongly associated with his 2006 and 2010 offenses. Defendant would be likely to engage in sexually violent predatory behavior if simply released to the community, but he could be safely and effectively managed on parole under the right conditions.

On parole, defendant would be subject to GPS monitoring. It would be necessary to give defendant a structured schedule, and to participate in a structured treatment program. The program would need to include cognitive behavioral therapy, polygraph testing, sex offender treatment, and alcohol treatment. Dr. Blasingame knew such a program existed in Sacramento County and believed one existed in Placer County also. As a sex offender registrant, he would be required to submit to polygraph examinations, and would not be allowed to live within a certain distance of a school or park.

Dr. Blasingame also recommended defendant get evaluated by a medical doctor for a possible prescription for a selective serotonin reuptake inhibitor, which can

11

significantly reduce the sex drive. A combination of parole monitoring and medication would allow defendant to be safely treated in the community.

Defendant's wife was married to defendant for 28 years at the time of the trial. Defendant would live with her in Placer County if he was released from custody. She thought a senior environment would be best for them; among her criteria was a place that would comply with parole restrictions on living near a park or school. She would comply with any restrictions on keeping alcohol or marijuana in the house and would report any safety plan violations. She was also willing to participate in defendant's treatment and would follow any directives limiting his access to their two grandchildren.

DISCUSSION

I

*The Petition Was Authorized*

Defendant contends the petition to commit him as an SVP was not authorized because it lacked the required assent of two evaluating psychologists before filing.

His claim is governed by section 6601. Under section 6601, if, after screening by the Department of Corrections and Rehabilitation and the Board of Parole Hearings, it is determined the prisoner is likely to be a sexually violent predator, then the prisoner is referred to the DSH for evaluation of whether he or she meets the SVP criteria as described in section 6600. (§ 6601, subd. (b).) Subdivision (c) of section 6601 requires the DSH to evaluate such persons under standard protocols and lists various risk factors to consider, including "criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." (§ 6601, subd. (c).)

The evaluation proceeds as follows:

"(d) Pursuant to subdivision (c), the person shall be evaluated by two practicing psychiatrists or psychologists, or one practicing psychiatrist and one practicing psychologist, designated by the Director of State Hospitals. If both evaluators concur that the person has a diagnosed mental disorder so that he or she is likely to engage in

12

acts of sexual violence without appropriate treatment and custody, the Director of State Hospitals shall forward a request for a petition for commitment under Section 6602 to the county designated in subdivision (i). Copies of the evaluation reports and any other supporting documents shall be made available to the attorney designated by the county pursuant to subdivision (i) who may file a petition for commitment.

"(e) If one of the professionals performing the evaluation pursuant to subdivision (d) does not concur that the person meets the criteria specified in subdivision (d), but the other professional concludes that the person meets those criteria, the Director of State Hospitals shall arrange for further examination of the person by two independent professionals selected in accordance with subdivision (g).

"(f) If an examination by independent professionals pursuant to subdivision (e) is conducted, a petition to request commitment under this article shall only be filed if both independent professionals who evaluate the person pursuant to subdivision (e) concur that the person meets the criteria for commitment specified in subdivision (d). The professionals selected to evaluate the person pursuant to subdivision (g) shall inform the person that the purpose of their examination is not treatment but to determine if the person meets certain criteria to be involuntarily committed pursuant to this article. It is not required that the person appreciate or understand that information." (§ 6601, subds. (d)-(f).)

Here, defendant was initially evaluated by Dr. Maram and Dr. Hupka. Dr. Maram issued a July 16, 2015 report finding defendant qualified as an SVP, while Dr. Hupka issued a July 26, 2015 report, which concluded defendant was not an SVP. Defendant was next evaluated by two independent psychologists, with Dr. Owen reporting on August 3, 2015, that defendant was not an SVP, and Dr. Vorwerk finding defendant was an SVP in an August 12, 2015 report. On August 13, 2015, Dr. Hupka submitted an addendum to his original report, finding he had changed his mind and concluded

13

defendant met the SVP criteria after receiving new information, defendant's 2010 psychological evaluation.

The People filed the petition on August 17, 2015.

Defendant contends the petition was unauthorized because both sets of evaluators split on whether defendant was an SVP. According to defendant, nothing in section 6601 authorizes DSH to send additional information to an earlier evaluator in an attempt to change his or her mind. He claims that once the independent evaluators were assigned after the initial split of opinion, DSH had acknowledged the existence of the initial split of opinion, which then could no longer be revised.

A case decided after briefing concluded addressed this issue.[3] *People v. Morrison* (2019) 34 Cal.App.5th 980 (*Morrison*) involved the People's appeal from a dismissed SVP petition. (*Id*. at p. 984.) Pursuant to the SVP screening process, the two state evaluators initially split over whether Morrison met the SVP criteria. (*Id*. at p. 983.) In accordance with section 6601, two independent psychologists were employed to evaluate Morrison. (*Morrison,* at p. 983.) As with the first evaluators, one psychologist found Morrison met the SVP criteria while the other did not. (*Ibid*.) The authorities then referred the matter to a peer reviewer, who found the initial evaluator who determined Morrison was not an SVP failed to consider all of the reports of Morrison's prison misconduct, which included incidents of sexually threatening behavior. (*Id*. at pp. 983-984.) After the peer reviewer pointed this out to the evaluator, the evaluator reviewed her reports and changed her opinion to finding Morrison met the SVP criteria. (*Id.* at p. 984.) The district attorney then filed an SVP petition, which the trial court dismissed, finding

---

[3]     Although defendant did not object to the petition, we address the merits as this claim goes to whether the trial court had jurisdiction to hear the petition and because defendant claims the failure to object constituted ineffective assistance of counsel.

14

no statutory authority for an evaluator to change his or her opinion. (*Ibid*.) The Court of Appeal reversed. (*Ibid.*)

The Court of Appeal first established the purpose of the SVP law. "Here, the Legislature included an express statement of its purpose and intent in an uncodified section of the statute, emphasizing a desire to protect the public from SVPs, and to secure treatment for SVPs." (*Morrison, supra*, 34 Cal.App.5th at pp. 989-990, citing Stats. 1995, ch. 763, § 1, p. 5921.) It rejected Morrison's assertion that subdivisions (d) and (f) of section 6601 created "a decision tree providing for evaluations to take place in a specific order such that once a set of 'independent' evaluations under subdivision (f) is conducted, those evaluations take precedence over earlier evaluations under subdivision (d)." (*Morrison*, at p. 990.) Morrison's contention misread the statute. (*Ibid.*) Subdivision (d) mandated that DSH shall forward the petition if both of the initial evaluators agreed that the person met the SVP criteria. (*Morrison*, at p. 990; see § 6601, subd. (d) ["If both evaluators concur that the person has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody, the Director of State Hospitals shall forward a request for a petition for commitment under Section 6602 to the county"].) This provision required a petition to be forwarded once the two state evaluators agreed Morrison was an SVP and did not make an exception for the situation presented in *Morrison*. (*Morrison*, at p. 990.)

The Court of Appeal found its interpretation consistent with the Supreme Court's description of the statutory scheme. " 'Read together, subdivisions (d), (e), and (f) of section 6601 amount to an unambiguous statutory prefiling requirement "that a petition for commitment or recommitment may not be filed unless two evaluators, appointed under the procedures specified in section 6601, subdivisions (d) and (e), have concurred that the person currently meets the criteria for commitment under the SVPA." [Citation.] Where this initial requirement is not met, the commitment may not proceed.' "

15

(*Morrison, supra*, 34 Cal.App.5th at p. 991, quoting *Reilly v. Superior Court* (2013) 57 Cal.4th 641, 647.)

Allowing an evaluator to reconsider his or her opinion in light of evidence previously not considered was consistent with the statutory scheme. Section 6601 "contemplates that in doing a 'full evaluation,' the original evaluators will do a complete assessment based on all relevant information. Without a complete review, an evaluator cannot comply with (and in fact, violates) the statutory mandate of considering all the risk factors." (*Morrison, supra*, 34 Cal.App.5th at p. 991.) While nothing in section 6601 expressly permitted a person to assess the reliability of an initial evaluation, nothing in the statute forbade it, and the structure of subdivisions (d) through (f) was "perfectly consistent with a process in which the two differing initial evaluations and the two supplemental evaluations are assessed and revaluated before being certified." (*Morrison*, at p. 992.) SVP status was not determined at the petition stage but at trial, so section 6601 should not be interpreted with unnecessary strictness to prevent the trier of fact from determining whether the person is an SVP. (*Morrison,* at pp. 992-993.) Finally, this interpretation of the statutory scheme was consistent with its legislative purpose and avoided an absurd result. (*Id.* at p. 993.)

We are persuaded by *Morrison*. Section 6601 sets forth the screening process for determining whether SVP proceedings should be initiated. It is secondary to the trial, where the SVP determination is made. It is for this reason that an error in the evaluation process will not cause a petition's dismissal unless the error is material; for nonmaterial errors less drastic means such as re-evaluation are proper. (*Reilly v. Superior Court, supra*, 57 Cal.4th at p. 655.) If section 6601 does not preclude re-evaluation due to an evaluation's nonmaterial error, it likewise should not be read to preclude an evaluator from changing his or her evaluation after receiving a more complete understanding of the relevant facts. Changing a decision when faced with new or more complete facts is a commonly accepted practice in the courts. (See, e.g., Pen. Code, § 1181, subd. (8)

16

[newly discovered evidence as grounds for new trial]; Code Civ. Proc., § 657, subd. (4) [same for civil cases].)  Courts likewise have some jurisdiction to reconsider an opinion or order when presented with factual error, legal error, or intervening changes in the law.  (See Code Civ. Proc., § 1008 [motion for reconsideration]; Cal. Rules of Court, rule 8.268 [rehearing by appellate court].)  If a court can change its mind when presented with valid reasons for doing so, then an SVP evaluator should be allowed to absent a specific statutory prohibition against it.

As *Morrison* correctly pointed out, section 6601 does not prohibit an evaluator from considering new evidence and changing the original conclusion as to whether the person meets the SVP criteria.  Section 6601, subdivision (f)'s command that a petition "shall only be filed if both independent professionals who evaluate the person pursuant to subdivision (e) concur that the person meets the criteria for commitment specified in subdivision (d)," must not be read in isolation.  (See *People v. Skiles* (2011) 51 Cal.4th 1178, 1185 [statutes not construed in isolation but " 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness' "].)  As pointed out in *Morrison*, subdivision (d) mandates the filing of a petition once the state evaluators agree that the person meets the criteria.  If an evaluator assigned under subdivision (d) changes his or her evaluation from a no to a yes, then a petition must be filed notwithstanding the disagreement between evaluators appointed pursuant to subdivision (e) over whether the SVP criteria were met.

This approach is consistent with the SVP law's purpose, which is " 'to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders.' [Citations.]" (*People v. McKee* (2010) 47 Cal.4th 1172, 1203 (*McKee*).)  Allowing an evaluator to change his or her findings based on previously unconsidered information advances both purposes by ensuring the evaluation is as accurate as possible.  Doing so does not sacrifice the liberty interests of the defendant in SVP proceedings, as he or she retains the primary protective mechanism, a

17

jury or court trial where the People must prove beyond a reasonable doubt that the defendant is an SVP. (§ 6604.)

In the law it is better to reach a correct decision after reconsidering the matter rather than sticking to a wrong one. The same applies here. Since both of the initial evaluators agreed defendant met the SVP criteria, the petition was authorized.[4]

## II

*Sanchez Error*

Defendant's trial concluded on June 28, 2016. Two days later, the California Supreme Court issued its opinion in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), which significantly restricted the use of hearsay evidence in the context of expert testimony. In light of the trial's timing, it is no surprise that hearsay evidence was improperly admitted under the *Sanchez* standard.[5] The question here is whether the now erroneously admitted evidence was prejudicial error. Defendant says the error was prejudicial, while the Attorney General claims the error was harmless. The Attorney General has the better argument

A.

Under the law prevailing at the time of the SVP trial, "an expert was permitted to testify relatively freely about the content of hearsay evidence relating to the

---

[4]     Defendant claims that upholding the petition will allow the DSH to manipulate the process by providing "new" information to evaluators in an attempt to persuade them to change their minds any time there is a split between evaluators. There is no evidence in the record that DSH or any other state actor tried to improperly influence any of the evaluators, and nothing in this opinion can be read as justifying such action. Likewise, this opinion cannot be read to condone seeking evaluations from different evaluators until finding those who agree with DSH.

[5]     Since the trial was before *Sanchez* was decided, the failure to raise an objection consistent with the *Sanchez* rule did not forfeit the contention on appeal. (*People v. Perez* (2020) 9 Cal.5th 1, 4.)

circumstances of the case at hand, if the evidence constituted a basis for his or her opinion. [Citation.]" (*People v. Jeffrey G.* (2017) 13 Cal.App.5th 501, 506.) Under Sanchez, "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Sanchez, supra*, 63 Cal.4th at p. 686.) As such, the statements are only admissible if they either fall under a hearsay exception or are independently proven. (*Ibid.*) However, an expert "may still *rely* on hearsay in forming an opinion, and may tell [the trier of fact] *in general terms* that he did so." (*Id.* at p. 685.) Pursuant to Evidence Code section 802, an expert may "relate generally the kind and source of the 'matter' upon which his opinion rests." (*Sanchez,* at p. 686.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.) Although *Sanchez* is a criminal case, its analysis of the admissibility of expert testimony under Evidence Code sections 801 and 802 also applies to cases arising under the SVP law. (*People v. Superior Court (Couthren)* (2019) 41 Cal.App.5th 1001, 1020-1021; *People v. Yates* (2018) 25 Cal.App.5th 474, 476; *People v. Burroughs* (2016) 6 Cal.App.5th 378, 407.)

B.

Defendant contends all four prosecution experts related inadmissible case-specific hearsay in their respective testimony. He identifies 19 different incidents of Dr. Maram relating case-specific hearsay in his testimony. Several of the incidents involved relating details of the various sex offense incidents in 1981, 2006, and 2009, either in reliance on police reports, unspecified reports, or statements by defendant to Dr. Nelson. Dr. Maram also related statements by defendant to a probation officer that he needed sex offender and alcohol treatment, and various statements to Dr. Nelson including that he was attracted to children, had an alcohol problem and was willing to castrate himself. Defendant also finds Dr. Maram related case-specific hearsay that defendant told Dr. Blasingame he had been molested and that defendant told different people at different

19

times whether he was molested and abused as a child. Dr. Maram also testified about the contents of other psychologist's reports, specifically the conclusions of the 2010 evaluation, additional contents of that report, and statements in Dr. Blasingame's report that child pornography was found on defendant's computer in 2010.

Defendant identifies 24 separate incidents of case-specific hearsay in Dr. Vorwerk's testimony. Many of the statements related facts of the different sex offense incidents as found in various reports. Dr. Vorwerk's testimony also related statements of defendant in the 2010 evaluation, Dr. Blasingame's report, and the probation report. He also finds case-specific hearsay in Dr. Vorwerk's testimony relating facts such as defendant had been on probation when arrested for the qualifying offense, his wife did not cooperate with the police, defendant had been found in the backyard with a ladder, he had admitted a sexual interest in children to other people, defendant had been exposing himself for decades, and he was found with child pornography and bestiality pornography. Finally, defendant notes Dr. Vorwerk also testified about defendant's participation in prison mental health services, and opinions expressed in the 2010 evaluation and Dr. Blasingame's report.

Defendant finds seven examples of case-specific hearsay in Dr. Owen's testimony. Dr. Owens testified that most of the offenses were committed against strangers, related statements made to defendant's wife that he was attracted to children and would seek treatment, that test results from another evaluator showed defendant's elevated sexual interest in prepubescent children, that defendant was on probation at the time of the qualifying offenses, that defendant was sexually interested in a 16-year-old girl, repeatedly offended, exposed himself to a child as an adult, and fondled girls, that defendant attributed his sex offense to alcohol, and related statements defendant made to the evaluator in 2010.

Defendant asserts Dr. Hupka's testimony contains nine instances of improper hearsay. Dr. Hupka relied on the 2010 report to relate admissions made by defendant

20

regarding information about defendant exposing himself to a young girl, and information about the 1981 case. He also testified to knowing defendant had been arrested for indecent exposure, relied on medical reports to relate information about defendant including his depression, said defendant gave different information to different evaluators, related facts of defendant's behavior in prison including his failure to participate in sex offender treatment, and that between 2009 and 2010 defendant was under the influence of alcohol and Ambien and had virtually no control over his behavior.[6]

C.

Since there is no Sixth Amendment right to confrontation in SVP cases, the allegedly improper hearsay was not subject to *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177]. (See *People v. Angulo* (2005) 129 Cal.App.4th 1349, 1368 ["the confrontation clause does not apply to civil commitment proceedings"].) We accordingly apply the harmless error test of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Sanchez* (2016) 63 Cal.4th 665, 698-699 (*Sanchez*).)

Several published cases have assessed *Sanchez* error in SVP proceedings under the *Watson* standard. This case differs from those as it involves a bench trial in which the factfinder made findings in support of its verdict. (See *People v. Flint* (2018) 22 Cal.App.5th 983, 987, 1005 [jury trial, *Sanchez* error harmless under *Watson*]; *People v. Bocklett* (2018) 22 Cal.App.5th 879, 886, 889-890 (*Bocklett*) [same]; *People v. Roa* (2017) 11 Cal.App.5th 428, 433 [jury trial, *Sanchez* error reversible under *Watson*]; *People v. Burroughs, supra*, 6 Cal.App.5th at p. 383 [same].) Whether the error was

---

[6] Defendant also notes his expert, Dr. Blasingame, also related four incidents of case-specific hearsay. Since this testimony could not prejudice defendant, we do not consider it.

harmless under *Watson* must be determined in light of the trial court's findings in support of the verdict.

In order to sustain an SVP petition, the People must prove four elements beyond a reasonable doubt: (1) conviction of a sexually violent offense; (2) a diagnosed mental disorder; (3) as a result of the diagnosed mental disorder, the defendant is a danger to the health and safety of others because he or she will engage in sexually violent criminal behavior; and (4) it is necessary to keep defendant in custody in a secure facility to ensure the health and safety of others. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 246, fn. 9; CALCRIM No. 3454.) Defendant stipulated to the first two factors; the trial court's findings focused on the last two.

The trial court found defendant met the definition of an SVP as listed in factor three because all of the experts came to this conclusion based on defendant's offense history, his failure to acknowledge the offenses, and his lack of insight into his treatment needs. The court noted the only real disagreement between the experts was regarding the fourth factor, whether defendant could be safely treated in the community, and three of the four experts who examined him concluded he must be treated in a secured facility.

The court found: "The evidence shows that Mr. Ding is currently unwilling and unable to accept responsibility for any of his sexual offenses. It is a significant factor that Mr. Ding himself does not believe he needs sexual offender treatment and denies his mental health disorders. He believes that as long as he remains sober, he can be successful. That is certainly a component to his success in the future." While the trial found Dr. Blasingame's treatment plan "thorough and well thought out," there were "too many variables in the plan" that were beyond the court's control. It concluded the prosecution proved the two disputed elements, three and four, beyond a reasonable doubt.

The combination of the stipulation and the trial court's findings alleviates the need for an item-by-item inquiry into the numerous instances of hearsay in the prosecution's expert testimony. The trial court found the third factor not based on any of the experts'

case-specific hearsay testimony, but on the fact that all four experts (the three prosecution and one defense) found that defendant was a sexually violent predator as defined in factor three. While the experts gave case-specific hearsay in support of those opinions, as previously discussed, *Sanchez* does not prevent an expert from considering such evidence and basing his or her conclusions on it. Although the court's findings noted the evidence upon which the experts based their conclusions, what persuaded the trial court was not the case-specific hearsay, but the unanimous opinion of the experts that defendant met the third factor.

The court's findings in support of the fourth factor likewise limits our inquiry. It found this factor based on defendant's unwillingness to take responsibility for his offenses, not thinking he needs sex offender treatment, denying his mental disorder, believing he can be successful so long as he remains sober, and the overly contingent nature of Dr. Blasingame's proposed treatment plan. The critique of the defense treatment plan is not based on case-specific hearsay, the court's findings related to defendant are all supported by evidence that was admissible notwithstanding *Sanchez*. As noted in our summary of the evidence introduced at trial, defendant made statements to Dr. Maram about his criminal history that either minimized them or attributed them to alcohol, denied being attracted to children, claimed he did not have a sexual abuse problem but had a substance abuse problem, and said nothing indicating an intent to voluntarily enter sex offender treatment. In his interview with Dr. Vorwerk, defendant denied fantasizing about children, and was unwilling to take responsibility for his sex offenses, blaming them on alcohol and drug abuse. Defendant told Dr. Hupka his sex offenses were attributable to alcohol abuse, denied being attracted to children, and his risk of offending was over because he no longer drank.

Under *Watson*, an error is harmless unless it is reasonably probable that defendant would have obtained a more favorable result in the absence of the error. (*People v. Hayes* (2006) 142 Cal.App.4th 175, 183.) Defendant's statements were admissible as

party admissions. (Evid. Code, § 1220.) Had the case-specific hearsay not been admitted, the trial court would have come to the same conclusions based on the unanimous expert opinion in regard to the third factor, and defendant's own statements that provided ample support for the court's findings on the fourth factor.

III

*Stipulation to the Probation Report*

At the conclusion of testimony, the prosecutor moved to admit People's Exhibit 7, the probation report from defendant's most recent sex offenses. Defense counsel replied that he believed the probation report "can be considered with regard to the facts of the underlying offenses," but would like to "double check that." After the recess, defense counsel stated: "I have looked at the Welfare and Institutions Code section 6600 subdivision (a) subdivision (3), which says statutorily the court can consider it. So I have no objection if the People want to submit that probation report as evidence." The trial court admitted the probation report "by stipulation, based on statutory requirements."

Defendant admits portions of the probation report were admissible but large portions of it were not, and trial counsel was ineffective for failing to object to and seek redaction of the inadmissible portions.

To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)

Where it is easier to dispose of an ineffective assistance of counsel claim on the grounds of prejudice, we need not address whether counsel's performance was deficient. (*In re Fields* (1990) 51 Cal.3d 1063, 1079.) To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 104 [178 L.Ed.2d 624].) To establish

24

prejudice, defendant must show " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Ibid*.) "The likelihood of a different result must be substantial, not just conceivable." (*Id*. at p. 112.)

The trial court did not cite to or rely on evidence in the probation report in support of its findings. The probation report related the details of the qualifying offenses, which was admissible notwithstanding any hearsay contained therein. (*People v. Otto* (2001) 26 Cal.4th 200, 206-208.) The other evidence in the probation report, biographical information about defendant, his and victim statements to the probation officer, and defendant's criminal record, played no role in the trial court's findings. Defendant has failed to carry his burden of establishing prejudice.

IV

*Trial Counsel Did Not Abandon Defendant*

Defendant contends trial counsel effectively abandoned him by pursuing what was effectively no defense to the SVP claim. Trial counsel's strategy centered on the fourth element of the SVP case, whether defendant could be safely treated and effectively treated in the community on a voluntary basis. The defense evidence in support of this claim consisted primarily of Dr. Blasingame's testimony detailing how defendant could be safely and effectively treated under means available through parole supervision, supplemented by the testimony of defendant's wife as to how she would support this program.

Defendant's contention centers on *People v. Krah* (2003) 114 Cal.App.4th 534 (*Krah*). The Court of Appeal held in *Krah* that it was not reversible error to exclude the terms and conditions of parole as defense evidence in an SVP proceeding. (*Id*. at pp. 537, 544.) Krah claimed the evidence was admissible under *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888 (*Ghilotti*), where the Supreme Court determined that, in

25

the context of evaluating a person pursuant to section 6601, subdivision (d), " 'insofar as the protocol permits, the evaluators may consider any factor which, in their professional judgment, is relevant to the ultimate issue whether the person is a substantial danger to reoffend if free in the community without any conditions, supervision, monitoring, or mandatory treatment in the Director's custody.' " (*Krah*, at p. 545, quoting *Ghilotti*, at p. 927.)  Krah asserted this standard applied to the general definition of sexually violent predator in section 6601, subdivision (a)(1) and thus established that " 'any factor bearing on the risk of an individual reoffending' is relevant when 'assessing whether the individual is a sexually violent predator.' " (*Krah*, at p. 545.)

The Court of Appeal rejected Krah's contention.  (*Krah, supra*, 114 Cal.App.4th at p. 546.)  Instead of allowing the evaluator to consider any factor bearing on the risk of reoffending, *Ghilotti* permitted consideration only of those factors permitted in the protocols or relevant to the risk of reoffending if released to the community without any conditions, supervisions, monitoring or mandatory treatment in the custody of the DSH. (*Krah,* at p. 546.)  "*Ghilotti* reinforces our conclusion that the relevant inquiry is whether the defendant's mental condition makes it likely he will reoffend.  Evidence that the defendant's condition does not preclude him from voluntarily pursuing treatment if unconditionally released would be relevant under this test.  [Citation.]  However, evidence that the defendant would be required to comply with terms and conditions of parole would not be relevant.  Such evidence has no bearing on the determination whether the defendant has a disorder which makes it likely he will reoffend; it does not relate to the nature of the defendant's disorder or reflect in any way his willingness or ability to pursue treatment voluntarily." (*Ibid.*)

Defendant claims that *Krah* renders irrelevant all of the evidence about conditions of parole and the opinions attached to them.  According to defendant, the trial court was supposed to decide whether he could be safely released on voluntary treatment without considering whether parole conditions would render him safe if released.  Defendant

26

claims the trial court acted this way by finding the parole conditions could not be relied on. Since the defense was limited to the fourth SVP factor, whether defendant could be safely released into the community, defendant's trial counsel effectively presented no defense.

While *Krah* may preclude consideration of parole conditions and supervision in determining the fourth SVP element, that case did not lead to the exclusion of such evidence or foreclose the defense presented at defendant's SVP trial. The evidence of defendant's supervision and treatment on parole was admitted without objection. Although the trial court was not persuaded by the defense, the findings in support of the verdict showed it gave the defense serious consideration and did not find it precluded as a matter of law. The fact that a defense was unsuccessful does not mandate a finding of ineffective assistance. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.]" (*Strickland v. Washington, supra*, 466 U.S. at p. 689.)

There was no question defendant met the first two SVP factors, having been convicted of a qualifying offense and having a diagnosed mental disorder, and all of the examining experts essentially agreed on the third SVP factor, that defendant's disorder rendered him dangerous to the safety of others. The only question was whether he could be safely released to the community. Since counsel was able to present the defense, the trial court considered it, and though the treatment and supervision plan developed by the defense expert was well thought out, trial counsel's actions were the product of

27

reasonable tactical considerations notwithstanding *Krah* and their ultimate failure. Defendant was not deprived of a defense.**7**

V

*Equal Protection, Ex Post Facto, and Tolling*

When a person is committed as an SVP, their parole period is tolled from the time the SVP commitment process begins until the SVP commitment concludes. (Pen. Code, § 3000, subd. (a)(4).) Under the procedure for committing mentally disordered offenders (MDO) (Pen. Code, § 2960 et seq.; the MDO Act), an MDO may be involuntarily committed as a condition of parole (Pen. Code, § 2962), as part of extending parole (Pen. Code, § 2966, subd. (c)), and following release from parole (Pen. Code, §§ 2970, 2972). As a practical matter, a person committed as an MDO does not have his or her parole tolled during commitment.

Defendant claims this disparate treatment between similarly situated MDO and SVP defendants violates equal protection. Since the law tolling his parole was not enacted until after he committed his qualifying offenses, he claims it is also an ex post facto punishment.

A. *Equal Protection*

"The MDO Act establishes a comprehensive scheme for treating prisoners who have severe mental disorders that were a cause or aggravating factor in the commission of the crime for which they were imprisoned. [Citation.]" (*People v. Garcia* (2005) 127 Cal.App.4th 558, 563.) The Supreme Court has held that, for the purposes of length of commitment and burden of proof to establish release, MDO's and SVP's were similarly situated for the purposes of equal protection analysis. (*McKee, supra*, 47 Cal.4th at pp.

---

**7**    Defendant also contends the cumulative effect of the errors identified in his opening brief deprived him of due process. Since the only errors involved *Sanchez* error and those errors were harmless, the claim is without merit.

28

1202-1203.)  The same applies in the context of defendant's claim regarding tolling of parole.  Assuming the contention was not forfeited by trial counsel's failure to raise it and the claim is ripe for review, we find no equal protection violation.

Defendant's contention was addressed in a case decided after supplemental briefing, *Bocklett, supra*, 22 Cal.App.5th 879.  Applying the strict scrutiny standard for differential treatment of protected liberty interests (see *People v. Green* (2000) 79 Cal.App.4th 921, 924 ["Strict scrutiny is the appropriate standard against which to measure claims of disparate treatment in civil commitment"]), the Court of Appeal found the disparate treatment of MDO's and SVP's justified by a compelling state interest. "California has shown a compelling interest to toll the parole period for SVP's so that SVP's receive parole supervision after they have been fully discharged from their commitment.  Notably, this is not a situation where MDO's are treated differently. Rather, it is a legal impossibility to toll the parole period for an MDO because mental health treatment for an MDO is imposed as a condition of parole.  [Citations.]" (*Bocklett*, at p. 894.)

The Court of Appeal agreed with other cases finding it was appropriate for the Legislature to conclude SVP's were a greater danger than MDO's given the greater harm caused by the sexually violent offenses underlying SVP commitment and the higher risk of reoffending posed by SVP's.  (*Bocklett, supra*, 22 Cal.App.5th at pp. 894-895; *McKee, supra*, 207 Cal.App.4th at pp. 1342-1347.)  Penal Code section 3000's tolling provision did not change the length of time an SVP spent on parole but merely changed when the period of parole starts.  (*Bocklett*, at p. 896.)  The change in the law tolling parole for SVP's was intended to close a loophole whereby a person committed as an SVP could, without the tolling provision, never be on parole as the period of parole would conclude before the SVP commitment ended.  (*Id.* at p. 895.)  Without the tolling provision, SVP " ' "offenders can be released into community with no supervision upon release from the state mental hospital." ' " (*Ibid.*, quoting Assem. Com. on Public Safety, Analysis of

29

Sen. Bill No. 179 (2011-2012 Reg. Sess.) as introduced Feb. 7, 2011, p. 4.) The greater potential for harm by SVP's provided a compelling state interest to ensure an SVP would be subject to parole supervision after the commitment ends. (*Bocklett*, at p. 896.)

We agree with *Bocklett*. The different treatment between SVP's and MDO's regarding parole tolling reflects the substantially greater harmed posed by SVP's. Just as these differences provided a compelling state interest to justify imposing a greater burden on SVP's to obtain their release (*McKee*, *supra*, 207 Cal.App.4th at pp. 1330-1331), it likewise provides a compelling state interest for the different approaches to parole taken by the SVP law and the MDO Act. Defendant's equal protection rights were not violated.

B. *Ex Post Facto*

Effective November 8, 2006, Penal Code section 3000 was amended by the voters to provide: "The parole period of any person found to be [an SVP] shall be tolled until that person is found to no longer be [an SVP], at which time the period of parole, or any remaining portion thereof, shall begin to run." (Pen. Code, former § 3000(a)(4), as amended by Prop. 83, § 17, eff. Nov. 8, 2006.) This changed on January 1, 2012, when the present law tolling parole during SVP commitment went into effect. (See *Bocklett, supra*, 22 Cal.App.5th at pp. 900-901.) As amended, "the statute tolls the period of parole for a person subject to SVP proceedings upon a finding of probable cause rather than upon a finding that the person is actually an SVP. [Citation]." (*Ibid.*; Pen. Code, former § 3000(a)(4), as amended by Stats. 2011, ch. 359, § 1.5.) The change in the law tolling parole for SVP's applied retroactively to those released by the Department of Corrections and Rehabilitation on or after January 1, 2012. (Pen. Code, § 3000, subd. (a)(5); *Bocklett*, at p. 901.) Defendant claims retroactively changing the tolling of his parole is an ex post facto punishment that violates the state and federal ex post facto prohibitions.

The primary purpose of the state and federal ex post facto clauses is to "prevent unforeseeable punishment." (*People v. Snook* (1997) 16 Cal.4th 1210, 1221.) Our Supreme Court has repeatedly held that SVP commitment is not punishment. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1175; *McKee, supra*, 47 Cal.4th at p. 1195.) Although defendant's claim addresses tolling of parole rather than SVP commitment, the same result applies. The purpose of the SVP law is not to punish the offender but to protect the public and treating the SVP. It is not punishment and the retroactive change in the law regarding parole tolling is not an ex post facto punishment.

### DISPOSITION

The judgment is affirmed.

_____/s/_____
BLEASE, Acting P. J.

We concur:

_____/s/_____
MAURO, J.

_____/s/_____
HOCH, J.